1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CHRISTINE O. GREGOIRE, Governor of
the State of Washington,

                    Plaintiff,

        v.

DONALD H. RUMSFELD, in his official
capacity as Secretary of Defense,

                    Defendant.

Case No. C05-5583RJB

ORDER

This matter comes before the Court on Defendant's Motion to Dismiss (Dkt. 16-1) and Plaintiff's Motion for Summary Judgment (Dkt. 17-1). The Court has reviewed all documents filed in support of and in opposition to these motions, has reviewed the entire file, and is fully advised.

## I.    BASIC AND PROCEDURAL FACTS

Plaintiff, Washington Governor, Christine O. Gregoire ("Governor"), filed this action seeking to permanently enjoin the Secretary of Defense, Donald H. Rumsfeld ("Secretary"), from implementing certain of the Defense Base Closure and Realignment Commission's ("Commission" or "BRAC Commission") final 2005 recommendations concerning Washington's Air National Guard ("ANG"). Dkt. 1. The Commission's final recommendations were made pursuant to the Defense Base Closure and Realignment Act of 1990 ("BRAC" or "BRAC ACT"), as amended note following 10 U.S.C. § 2687 (2000 ed., Supp. II). The Governor's Complaint alleges that implementation of the recommendations

infringes on Washington State's right to maintain a well regulated militia in violation of the Second Amendment to the U.S. Constitution, violates 32 U.S.C. § 104, and exceeds the Secretary's statutory authority under BRAC. Dkt. 1, at 11-13. In order to fully understand the parties' positions, a review of the background and purpose of both the National Guard and the BRAC Act is necessary.

### A.    HISTORY OF NATIONAL GUARD

In the earliest years of our country, two conflicting themes led to a compromise in the text of the Constitution and in later statutory enactments. *Perpich v. Dept. of Defense*, 496 U.S. 334, 340 (1990).

> On the one hand, there was a widespread fear that a national standing Army posed an intolerable threat to individual liberty and to the sovereignty of the separate States, while, on the other hand, there was a recognition of the danger of relying on inadequately trained soldiers as the primary means of providing for the common defense. Thus, Congress was authorized both to raise and support a national Army and also to organize the Militia.

*Id.* Accordingly, the Second Amendment to the U.S. Constitution provides: "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Constitution further provides that Congress shall have power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. Congress also has the power to "provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress." U.S. Const. art. I, § 8, cl. 16.

The modern National Guard was created in 1903 when, pursuant to U.S. Const. art. I, § 8, cl. 15 and 16, ("Militia Clauses"), Congress enacted the Dick Act, 32 Stat. 775 (1903). *Perpich,* at 342. The Dick Act was amended in 1933 creating "two overlapping but distinct organizations . . . the National Guard of the various States and the National Guard of the United States." *Id.* at 345. "Under the 'dual enlistment' provisions of the statute that have been in effect since 1933, a member of the Guard who is ordered to active duty in the federal service is thereby relieved of his or her status in the State Guard for the entire period of federal service." *Id.* Members of the National Guard therefore fulfill the historical function of the state militia and, at times, engage in federal service. *Id.* "In a sense, all of them now must keep three hats in their closets-a civilian hat, a state militia hat, and an army hat-only one of which is worn at any particular time." *Id.* at 348. Art. 3 § 8 of the Washington Constitution provides that the Governor

is the "commander-in-chief of the military in the state except when they shall be called into the service of

the United States."  While in federal service, the President is the commander-in-chief of the National

Guard.  U.S. Const. art. II § 2.

In keeping with the dual nature of the National Guard, Congress passed the Armed Forces Reserve

Act.  32 U.S.C. § 104.  As amended, relevant portions of  32 U.S.C. § 104 provide:

> **(a)** Each State, the Commonwealth of Puerto Rico, Guam, and the Virgin Islands may fix
> the location of the units and headquarters of its National Guard.
>
> **(b)** Except as otherwise specifically provided in this title, the organization of the Army
> National Guard and the composition of its units shall be the same as those prescribed for the
> Army, subject, in time of peace, to such general exceptions as the Secretary of the Army
> may authorize; and the organization of the Air National Guard and the composition of its
> units shall be the same as those prescribed for the Air Force, subject, in time of peace, to
> such general exceptions as the Secretary of the Air Force may authorize.
> **(c)** To secure a force the units of which when combined will form complete higher tactical
> units, the President may designate the units of the National Guard, by branch of the Army
> or organization of the Air Force, to be maintained in each State, the Commonwealth of
> Puerto Rico, the District of Columbia, Guam, and the Virgin Islands. However, no change
> in the branch, organization, or allotment of a unit located entirely within a State may be
> made without the approval of its governor.

The Governor's consent has not been sought, nor been given, for implementation of the 2005 BRAC

recommendations regarding the Washington National Guard.  Dkt. 1.  In order to put the 2005 BRAC

recommendations in context, a brief review of BRAC's history and structure is useful.

## B.    BRAC ACT'S BACKGROUND AND PROCESSES

After struggling with decades of political gridlock, BRAC was enacted to "provide a fair process

that [would] result in the timely closure and realignment of military installations inside the United States."

10 U.S.C. §2687 note (§2901(b)).  "In adopting [BRAC], Congress was intimately familiar with repeated,

unsuccessful, efforts to close military bases in a rational and timely manner."  *Dalton v. Specter*, 511 U.S.

462, 480 (1994)(Souter, J., *concurring in part and concurring in judgment*).  As amended, the 1990

BRAC Act provided for four successive rounds of base closures and realignments in 1991, 1993, 1995,

and 2005.  10 U.S.C. §2687 note (§ § 2903(c)(1), 2904(a)(1)).  In contemplation of each closure, BRAC

sets up a distinctive statutory regime, with a series of "tight and rigid deadlines on administrative review

and Presidential action, with unbending deadlines prescribed for each round."  *Dalton*, at 480.

Under BRAC, the 2005 round of the process was to begin when the Secretary certified to Congress

that there was a need to close and realign military installations and that such action would "result in annual

net savings for each of the military departments." 10 U.S.C. §2687 note (§ 2912(b)(1)(B)).  The President

then had until May 15, 2005, to nominate commissioners for Senate confirmation.  *Id.* at § 2912(d).  By

May 16, 2005, the Secretary was to submit to the Commission a list of U.S. military installations

recommended for closure or realignment.  *Id.* at § 2914(a).  The Commission, in turn, was required to hold

public hearings, prepare a report, reviewing the Secretary's recommendations and making its own

recommendations, and then transmit its report to the President by September 8, 2005.  *Id.* at § § 2903(d),

2914(d).  The President had until September 23, 2005 to either approve or disapprove of the

Commission's recommendations in their entirety.  *Id.* at § 2914(a).  If the President had disapproved the

Commission's recommendation, the Commission could have sent a revised list by October 20, 2005.  *Id.* at

§ 2914(e).  Upon receipt of the President's approval, Congress had 45 days to enact a joint resolution

disapproving the Commission's recommendations.  *Id.* at § 2904(b).  Barring a joint resolution, BRAC

provides that the Secretary shall initiate all closures and realignments within two years, and complete all

closures and realignments no later than six years, after the date the President transmits approval of the

Commission's recommendations to Congress.  *Id.* at § 2904(a)(4)-(5).

### C.    2005 BRAC RECOMMENDATIONS

On May 13, 2005, the Secretary made the following recommendation, among others, to the BRAC

Commission:

> Realign Fairchild Air Force Base WA.  The 141st Air Refueling Wing (ANG) will associate
> with the 92nd Air Refueling Wing at Fairchild Air Force Base, and the 141st Air Refueling
> Wing's eight KC-135R aircraft are distributed to the 185th Air Refueling Wing (ANG),
> Sioux Gateway Airport Air Guard Station, IA.  The 256th Combat Communications
> Squadron and 242nd Combat Communications Squadron, which are ANG geographically
> separated units at Four Lakes and Spokane, are relocated into available facilities at Fairchild
> Air Force Base.

2005 Defense Base Closure and Realignment Commission Report to the President (2005 BRAC

Commission Report"), Vol. I at 169 (available at http://www.brac.gov/finalreport.asp).  The parties do not

dispute that Fairchild Air Force Base is a federally owned facility.  The parties do not dispute that the eight

KC-135R aircraft at issue are the property of the federal government.  The Complaint alleges, and the

Secretary does not dispute, that the 256th Combat Communications Squadron is located in Washington

state on Four Lakes Communications Station, a federally owned facility under license to the State of

Washington.  Dkt. 1.  The 242nd Combat Communications Squadron is located in Washington State on

1    Geiger Field, a state owned facility under lease to the United States.  Dkts. 1 and 16-4.

2        After holding public hearings, the Commission adopted the recommendations on August 26, 2005

3    and issued a report to the President.  Dkt. 16-2.  This case was filed on September, 7, 2005.  Dkt. 1.  On

4    September 15, 2005, the President approved the Commission's recommendations and certified his approval

5    to Congress.  *Id*.  Congress did not enact a joint resolution disapproving the Commission's

6    recommendations within the 45 day time limit.  *Id*.  Accordingly, the Secretary's time to initiate the

7    closures and realignments has begun.  10 U.S.C. §2687 note (§ 2904(a)(4)).

8        **D.    PENDING MOTIONS**

9        Defendant now files a Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) arguing

10   that:  1) the Governor's claims present nonjusticiable political questions, 2) the Court lacks jurisdiction to

11   enjoin implementation of the Commission's recommendations because the carefully considered statutory

12   scheme, purpose, and history of BRAC evince Congress's intent to preclude judicial review, 3) even if her

13   claims were justiciable and the Court had jurisdiction, the Governor has not identified a proper cause of

14   action, 4) the Secretary and the Commission did not exceed their authority under BRAC, 5) Plaintiff's

15   claims under 32 U.S.C. § 104 must fail, and 6) no violation of the Second Amendment occurred.  Dkt. 16-

16   1.

17       The Governor Responds and moves for Summary Judgment, arguing that: 1) because 32 U.S.C. §

18   104 requires gubernatorial consent for changes to the branch, organization, or allotment of a National

19   Guard unit, and such consent has not been obtained, the Secretary's planned acts cannot lawfully be

20   implemented, 2) under the legislative history of  32 U.S.C. § 104, the Governor's consent is required, 3)

21   the consent requirement is not in conflict with BRAC, is not impliedly repealed, and must be given effect,

22   4) the Secretary does not have any authority under BRAC to implement the recommendations, 5) the

23   Secretary's planned acts violate the Second Amendment, and 6) the Secretary's assertions regarding

24   jurisdiction and justiciability are without merit.  Dkt. 17-1.

25       The Secretary Responds: 1) the political question doctrine renders the Governor's Constitutional

26   and statutory claims non-justiciable, 2) because Congress precluded the Governor's implementation claims

27   from judicial review, this Court lacks jurisdiction to consider them, 3) Congress expressly required the

28   Secretary to realign these installations, and he neither needs gubernatorial consent, nor violates the Second

1    Amendment, by moving federal property or by regulating the use of federal bases.  Dkt. 18-1.

2        The Governor replies, arguing that: 1) her claims do not present nonjusticiable political questions,

3    2) judicial review of the Secretary's planned acts is not precluded, 3) she is entitled to summary judgment

4    because her action is not precluded by a "private right of action" theory, 4) the Secretary's planned acts,

5    without her consent, violate 32 U.S.C. § 104, and exceed his statutory authority, 5) the Secretary's

6    planned acts, without her consent, violate the Second Amendment.  Dkt. 19.

7                            **II.   CLAIMS AND DEFENSES**

8        **A.    THE GOVERNOR'S CLAIMS**

9        The Governor's first claim is that the Secretary's implementation of the 2005 BRAC Commission's

10   recommendations regarding the distribution of the eight KC-135R aircraft, the relocation of the 256th

11   Combat Communications Squadron and 242nd Combat Communications Squadron, and the association of

12   the 141st Air Refueling Wing (ANG) with the 92nd Air Refueling Wing at Fairchild Air Force Base, will

13   violate Washington State's right to maintain a well regulated militia contrary to the Second Amendment to

14   the U.S. Constitution.  Dkt. 1 at 13.  The Governor's second claim is that the Secretary's implementation

15   of the recommendations would change the "branch, organization, or allotment of a unit located entirely

16   within a State" without her consent and so violates 32 U.S.C. § 104(c), and that the State has fixed the

17   locations of the 141st, 256th, and 242nd and so the Secretary's implementation of the recommendations

18   would violate 32 U.S.C. § 104(a).  *Id.*, at 12.  The Governor's third claim is that the Secretary's

19   implementation of the BRAC recommendations would exceed his statutory authority under BRAC.  *Id.*, at

20   11.

21       **B.    THE SECRETARY'S DEFENSES**

22       The Secretary argues that the Governor's claims should be dismissed because the political question

23   doctrine bars consideration of each of the claims.  Dkts. 16-1 and 18-1.  He argues that this Court lacks

24   subject matter jurisdiction to consider the Governor's claims because the language, structure, legislative

25   history, and objectives of the Act, indicate that Congress did not intend judicial review of actions taken

26   under BRAC.  *Id.*  The Secretary argues that the Governor's claims should be dismissed because she has

27   failed to identify a "private right of action" or "private remedy for her claims."  *Id.*  Lastly, the Secretary

28   argues that neither the Governor's § 104 claim, nor her claim that the Secretary exceeded his statutory

1   authority states a claim for which relief may be granted. *Id.*

2                              **III.   DISCUSSION**

3   **A.      ORGANIZATION OF OPINION**

4          The issues raised by the Secretary's Motion to Dismiss should be considered first because if the

5   Motion to Dismiss is granted, the Governor's Motion for Summary Judgment is rendered moot.  This

6   opinion will address each of the Governor's claims in turn:  1) the Second Amendment claim; 2) the § 104

7   claim; and 3) the excess of statutory authority claim; and will determine whether each claim survives each

8   of the Secretary's defenses:  1) whether the claims are barred by the political question doctrine, 2) whether

9   the Court has subject matter jurisdiction to consider these claims, 3) whether the Governor has a private

10  cause of action and a private remedy for each of her claims, and 4) whether any of the claims state a claim

11  upon which relief can be granted.

12  **B.      STANDARD ON MOTION TO DISMISS**

13         On a motion to dismiss, the Plaintiff bears the burden of establishing that the court has subject

14  matter jurisdiction on a Fed. R. Civ. Pro. 12(b)(1) motion.  *Tosco Corp. v. Communities for a Better*

15  *Environment,* 236 F3d 495, 499 (9th Cir. 2001).  However, in reviewing a Fed. R. Civ. Pro. 12(b)(1)

16  motion to dismiss for lack of jurisdiction, the allegations in the plaintiff's complaint are taken as true.

17  *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).

18         A motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6) tests the legal sufficiency of the claims

19  asserted in the complaint.  *Ileto v. Glock Inc.,* 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  The court may

20  dismiss a claim then if it appears beyond doubt that the plaintiff can prove no set of facts to support the

21  claim that would entitle the plaintiff to relief.  *Keniston v. Roberts*, 717 F.2d 1295, 1300 (9th Cir. 1983),

22  *citing Conley v. Gibson*, 355 U.S. 41, 45-56 (1957).  Dismissal may be based on either the lack of a

23  cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.  *Balistreri*

24  *v. Pacifica Police Department*, 901 F.2d 696, 699 (9th Cir. 1990).  Material allegations are taken as

25  admitted and the complaint is construed in the plaintiff's favor.  *Keniston v. Roberts*, 717 F.2d 1295 (9th

26  Cir. 1983).  However, a plaintiff must plead factual allegations with specificity; vague and conclusory

27  allegations of fact fail to state a claim for relief.  *Colburn v. Upper Darby Township*, 838 F.2d 663, 666

28  (3rd Cir. 1988).

## C.    SECOND AMENDMENT RIGHT TO A WELL REGULATED MILITIA

### 1.    Political Question Doctrine

Turning first to the Secretary's defense that the political question doctrine bars consideration of the Governor's claim that the implementation of the BRAC recommendations violates Washington's Second Amendment right to a well regulated militia, the Court notes that "[t]he political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Society*, 478 U.S. 221, 230 (1986).  Three nonjusticiable political questions, identified in *Barker v. Carr*, 369 U.S. 186 (1962), are alleged to be at issue here: 1. "textually demonstrable constitutional commitment of the issue to a coordinate political department;" or 2. "a lack of judicially discoverable and manageable standards for resolving it;" or 3. "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government."  Dkt. 16-1, at 24.

In order to determine whether there has been a textual commitment to a coordinate department of the Government, the Constitution must be interpreted.  *Powell v. McCormack*,  395 U.S. 486, 520 (1969). In other words, what power the Constitution confers upon the coordinate political department must first be determined, before it can be determined to what extent, if any, the exercise of that power is subject to judicial review.  *Id.*

"The constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping."  *U.S. v. O'Brien*, 391 U.S. 367, 377 (1986).  The Secretary argues that it is "well established that decisions regarding raising, supporting, and allocating the Nation's military forces are textually entrusted by the Constitution to the political branches."  Dkt. 16-1, at 24 (*citing* U.S. Const. art. I, § 8, cl. 12, 13, 15, 16, and art. II).  Indeed, the Constitution specifically gives Congress the power to "provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress."  U.S. Const. art. I, § 8, cl. 16.  In *Gilligan v. Morgan*, 413 U.S. 1 (1973), the Supreme Court addressed a case where university students sought "judicial evaluation of the

appropriateness of the training, weaponry and orders of the Ohio National Guard" and continuing judicial surveillance to ensure compliance with "whatever training and operations procedures may be approved by that Court." *Id.* at 6. Holding that the student's claims were barred by the political question doctrine, the Court found that,

> It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible-as the Judicial Branch is not-to the electoral process. Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability.

*Id.* at 10. The Court, however, noted that, "[i]n concluding that no justiciable controversy is presented, it should be clear that we neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law for specific unlawful conduct by military personnel, whether by way of damages or injunctive relief." *Id.* at 11-12.

The Governor's claim that Washington's Second Amendment right to maintain a "well regulated militia" would be violated if the Secretary implements the 2005 BRAC recommendations presents non-justiciable political questions. In order to determine whether Washington's right to a "well regulated militia" was violated, this Court would have to determine the contours of that right. This inquiry would necessarily entail examining what constituted a "well regulated militia," and would require a "judicial evaluation of the appropriateness of the training, weaponry and orders" given to the National Guard, determinations which were specifically held to be barred by the political question doctrine in *Gilligan*. 413 U.S. at 6. The necessity of resolving these sorts of political questions become apparent when the Court considers the Governor's arguments in favor of Summary Judgment. In arguing that the State's right had been violated, the Governor points out the strategic inadvisability of the recommendations. Dkt. 17-1, at 36-37. She further argued that these proposed "changes would adversely affect [her] ability to properly train and recruit National Guard members and engage in necessary homeland security and emergency preparedness and response functions." *Id.* at 37. Here, as the Court found in *Gillian*, engaging in "decisions as to the composition, training, equipping, and control of a military force" are decisions constitutionally committed to Congress and the States and present issues for which courts are ill suited to

manage.  413 U.S. at 10.  Accordingly, the Governor's Second Amendment claim is barred by the political question doctrine.  To hold otherwise would necessarily involve the Court in deciding whether the implementation of the 2005 BRAC recommendations was proper military strategy.

### 2.    Other Defenses

This opinion need not address the Secretary's remaining defenses as to this claim.

### D.    GUBERNATORIAL CONSENT UNDER 32 U.S.C. § 104

The Secretary argues that the Governor's claim under § 104 should be dismissed because: 1) consideration of the claim is barred by the political question doctrine, 2) Congress intended to preclude judicial review of actions taken under BRAC, 3) the Governor has failed to identify a private cause of action and private remedy, and 4) her consent is not required for the Secretary to implement the 2005 BRAC recommendations.  Dkts. 16-1 and 18-1.

### 1.    Political Question Doctrine

The Governor's 32 U.S.C. § 104 claim is not barred by the political question doctrine.  The Governor's § 104 claim, that her consent is required before the Secretary can implement the BRAC recommendations, does not require the Court to engage in determinations of how to properly "organize, arm, or discipline" the National Guard.  *Gillian,* at 10.  Instead, the Governor's  § 104 claim requires the Court to engage in the traditional exercises of statutory construction, interpretation of constitutional provisions, and application of the law to the facts.  In regard to this claim, the Governor asks the Court to determine whether her consent is required for the Secretary's planned acts based upon the statutory language of § 104, not whether implementation of the 2005 BRAC recommendations is advisable military strategy.  These are precisely the type of issues the Court has "discoverable and manageable standards for resolving."  *Baker* at 212.  The Court is not required, nor will, engage in any decisions about military strategy in deciding this claim.

The Secretary concedes that this is a essentially a political fight between the political branches of the federal government and the State of Washington.  Dkt. 18.  The Secretary points to the plurality opinion in *Goldwater v. Carter*, 444 U.S. 996 (1979), and argues that "where the Constitution allocates power to decide a particular matter only to the President and Congress collectively, as in the case of military allocation affairs, the Judiciary has no role in mediating any dispute they may have over their

1  respective roles." Dkt. 16-1, at 24.  The Secretary's reasoning is problematic.  The claim under 32 U.S.C.

2  § 104 revolves around issues of federalism, that is, the division of power between the federal government

3  and a state, rather then one which involves a "coordinate political department."  The Secretary does not

4  point to any authority which applies the political question doctrine to a dispute over the division of power

5  between a state and the federal government.  Consideration of the Governor's § 104 claim is not barred by

6  the political question doctrine.

### 2.   Congressional Intent to Preclude Judicial Review of § 104 Claim

8         Federal courts are courts of limited jurisdiction.  *Kokkonen v. Guardian Life Ins. Co. Of America,*

9  511 U.S. 375, 377 (1994).  Pursuant to U.S. Constitution art. III, Congress alone determines federal

10 courts' subject matter jurisdiction.  "Whether and to what extent a particular statute precludes judicial

11 review is determined not only from its express language, but also from the structure of the statutory

12 scheme, its objectives, its legislative history, and the nature of the administrative action involved."  *Block v.*

13 *Community Nutrition Institute,* 467 U.S. 340, 346 (1984).

14        The party asserting jurisdiction, here, the Governor, bears the burden of establishing that the Court

15 has jurisdiction.  *Kokkonen* at 377.  "[O]nly upon a showing of clear and convincing evidence of a contrary

16 legislative intent should the courts restrict access to judicial review."  *Lindahl v. Office of Pers. Mgmt.,*

17 470 U.S. 768, 779-780 (1985) (*citing Abbott Laboratories v. Gardner,* 387 U.S. 136, 141 (1967))

18 (*internal quotations omitted*).

> In the context of preclusion analysis, the clear and convincing evidence standard is not a rigid evidentiary test but a useful reminder to courts that, where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling. That presumption does not control in cases such as this one, however, since the congressional intent to preclude judicial review is fairly discernible in the detail of the legislative scheme.

*Block* at 351.

        The Secretary cites Justice Souter's concurring opinion in *Dalton v. Specter*, 511 U.S. 462 (1994),

in support of his position that Congress intended to preclude judicial review of actions taken pursuant to

BRAC.  Dkts. 16-1, and 18-1.  In *Dalton*, an action was brought under the Administrative Procedures Act

("APA") seeking to enjoin the Secretary of Defense from closing a base pursuant to BRAC.  511 U.S. 462.

The Court decided the case on narrow grounds, holding that "the actions of the Secretary and the

Commission cannot be reviewed under the APA because they are not 'final agency actions.'" *Id*. at 476.

The Court further held that "[t]he actions of the President cannot be reviewed under the APA because the President is not an 'agency' under [APA]." *Id.* Justice Souter wrote a concurring opinion, in which three other justices joined, finding "[i]t [was] not necessary to reach the question . . . of whether the [Commission's] report is final agency action, because the text, structure, and purpose of the Act compel the conclusion that judicial review of the Commission's or the Secretary's compliance with it is precluded." *Id.* at 479. Justice Souter's concurring opinion is persuasive: the express language, structure, objectives, legislative history and the nature of the agency action compel the conclusion that Congress intended to preclude judicial review of actions taken pursuant to BRAC.

a.   Express Language, Structure of Statute, and Objectives

The Governor properly points out that there is no express statutory language that prohibits judicial review of actions taken pursuant to BRAC. Dkt. 17-1. However, the inquiry does not end there. *Block* at 346. The structure and objectives of the BRAC Act imply Congressional intent to preclude judicial review. As detailed above, BRAC sets out specific and rigid deadlines for the Secretary, Commission, President, and Congress. 10 U.S.C. §2687 note (§ § 2903, 2904, 2912, and 2914). "It is unlikely that Congress would have insisted on such a timetable for decision and implementation if the base-closing package would be subject to litigation during the periods allowed, in which case steps toward closing would either have to be delayed in deference to the litigation, or the litigation might be rendered moot by completion of the closing process." *Dalton,* at 481. Additionally, under BRAC, the Commission is disbanded at the end of the base closure rounds, an unlikely feature if Congress intended judicial review because the Commission is "the only entity authorized to provide further review and recommendations." *Id.* Moreover, BRAC's structure also requires that the President and Congress accept the all Commission's recommendations or none of them. *Id.* "Neither the President nor Congress may add a base to the list or 'cherry pick' one from it." *Id.* "This mandate for prompt acceptance or rejection of the entire package of base closings can only represent a considered allocation of authority between the Executive and Legislative Branches to enable each to reach important, but politically difficult, objectives." *Dalton* at 481. It is unlikely, then that Congress intended to permit the Courts, through judicial review, to untie the package. *Id.* Justice Souter, in *Dalton,* also points out that BRAC includes a provision for administrative review, and a provision for judicial review of claims brought under the National Environmental Policy Act of 1969 ("NEPA") within

narrow time frames. *Id.* at 483. "Congress surely would have prescribed similar time limits to preserve its considered schedules if [judicial] review of other claims had been intended." *Id.*

> b.   Legislative History and Nature of the Action

Generally, there is a strong presumption favoring judicial review. *Id.* at 479. The presumption favoring judicial review may be overcome by "specific legislative history that is a reliable indicator of congressional intent." *Block*, at 350. There is evidence in the legislative history of the BRAC Act that indicates Congress's intent to preclude judicial review of the Secretary's implementation of the Commission's recommendations. For example, a 1990 House Conference Report that stated "[s]pecific actions [under BRAC] which would not be subject to judicial review include . . . the Secretary's actions to carry out the recommendations of the Commission." H.R. Conf. Rep. No. 101-923, at 706 (1990). The Governor argues that this portion of the legislative history is irrelevant, and is silent regarding the claims made here, such as the claim that the Secretary is exceeding his authority under BRAC or will violate other federal statues or Constitutional provisions. Dkt. 19, at 3 n. 1. By itself, this portion of legislative history is not definitive. However, the legislative history is an additional indication of Congress's intent to preclude judicial review of the Secretary's implementation of the 2005 BRAC recommendations.

The nature of the Secretary's action in implementing the BRAC recommendations also supports the argument that Congress intended to preclude judicial review of the Secretary's actions. The Governor argues that Justice Souter's concurring opinion in *Dalton* is not applicable here because "this in not action challenging whether [the Secretary] properly exercised decisionmaking discretion under a statute that commits decisionmaking discretion to him." Dkt. 17-1, at 40. The Governor is correct, BRAC mandates that the Secretary shall implement the recommendations. 10 U.S.C. §2687 note (§ 2904(a)). The Secretary's implementation of the 2005 BRAC recommendations is, in fact, the result of a joint effort between Congress and the Executive. As detailed above, these actions are a product of the two branches working together to accomplish a difficult task. The fact that the Secretary does not have discretion lends further strength to the argument that Congress did not intend judicial review of his implementation of those recommendations.

"While no one aspect of the [BRAC] Act, standing alone, would suffice to overcome the strong presumption in favor of judicial review," when all the available information is considered, it amounts to clear and convincing evidence that the text, structure, objectives, and legislative history "can be understood no other way than as precluding judicial review" of the Governor's claim under 32 U.S.C. § 104.  *Dalton,* at 483-4.

### 3.        Private Right of Action and Private Remedy for the Governor under § 104

Congress must create private rights of action to enforce federal law.  *Alexander v. Sandoval,* 532 U.S. 275, 286-7 (2001)(*internal citations omitted*).

> The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.  Statutory intent on this latter point is determinative.  Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.

*Id.*, at 286-7(*internal citations omitted*).  The Supreme Court created a four part test to determine whether a federal statute creates a private right of action for a particular plaintiff.  *Cort v. Ash,* 422 U.S. 66, 78(1975).  While there is some authority suggesting that the four-factor *Cort v. Ash* test is no longer the exclusive means by which to determine when a private cause of action exists, courts still apply this test in making this determination.  *Opera Plaza Residential Parcel Homeowner's Ass'n v. Hoang,* 376 F.3d 831, 834 (9th Cir. 2004)(*internal quotations and citations omitted*).  The *Cort* factors are:

> First, is the plaintiff one of a class for whose especial benefit the statute was enacted-that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purpose of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally delegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort,* 422 U.S. at 78 (*internal citations and quotation marks omitted*).  Although the Ninth Circuit has not addressed whether a governor brings a "private right of action," when suing in her official capacity, it found that a state could not bring a claim where there was no private right of action in the statute for that claim.  *See Dept. of Parks and Rec. for State of California v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1133 (9th Cir. 2006)(finding that State did not have a private right of action for registering a mark giving rise to a likelihood of confusion with another mark under 15 U.S. C. § 1052).  In light of the Ninth Circuit's holding in *Bazaar Del Mundo Inc.*, it appears that as a representative of the State, the Governor

must also have a private right of action and private remedy to bring an action against the federal government.

In light of the *Cort* factors, the Governor has identified Congressional intent to create a private right of action and a private remedy under 32 U.S.C. § 104. The Governor is clearly "one of the class for whose especial benefit the statute was enacted." *Cort* at 78. She was given the power to consent or withhold her consent to changes in the "branch, organization or allotment of a unit." The text and legislative history of § 104 indicates that Congress did intend to allow a Governor to challenge actions that violate her right to grant or withhold her consent under § 104. Moreover, it is consistent with the underlying purpose of the legislative scheme (to maintain the careful balance between state and federal control of the National Guard) to imply such a remedy for the Governor. Lastly, this claim is not a claim which is traditionally delegated to state law, there is no state law remedy, and so a federal remedy is appropriate.

**4.      Whether the Governor's § 104 Claim States a Claim upon which Relief Can be Granted**

"The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari,* 417 U.S. 535, 551 (1974). "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

The Secretary argues that the Governor's interpretation of 32 U.S.C. § 104(c), that her consent is required for the Secretary to implement the 2005 BRAC recommendations, directly conflicts with BRAC's statutory command that the Secretary shall implement the BRAC recommendations. Dkt. 16-1, at 36. Paragraph (c) of 32 U.S.C. § 104 provides,

> To secure a force the units of which when combined will form complete higher tactical units, the President may designate the units of the National Guard, by branch of the Army or organization of the Air Force, to be maintained in each State, the Commonwealth of Puerto Rico, the District of Columbia, Guam, and the Virgin Islands. However, no change in the branch, organization, or allotment of a unit located entirely within a State may be made without the approval of its governor.

Key to deciding whether the Governor's consent is required before the Secretary can implement the recommendations is determining the meaning of the phrase "no change in the branch, organization or allotment of a unit." In order to give effect to both the gubernatorial consent requirement in § 104, and the Secretary's obligations under BRAC, the language of the second sentence should be interpreted as a proviso which restricts the first sentence of the provision, as the Secretary urges. That is, no change in the affiliation of a National Guard unit, whether it be by "branch" of the Army or "organization" of the Air Force, may be made without the governor's consent. This interpretation is particularly sound "[s]ince there is a presumption that a given term is used to mean the same thing throughout a statute." *Brown v. Gardner*, 513 U.S. 115, 118 (1994) (*citing Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 608-609, 76 L.Ed. 1204 (1932)). The Governor argues for a broad interpretation of the terms "branch, organization, and allotment," creating an extensive gubernatorial consent requirement. Dkt. 17-1, at 18. She argues that "[t]he proposed 'association' of a National Guard unit, and the 'relocation' of National Guard units are all changes to the 'branch, organization or allotment of units located entirely within the State;' therefore, the gubernatorial consent requirement of 32 U.S.C. § 104(c) does explicitly apply to them." Dkt. 17-1, at 23. The Governor's proffered construction overlooks the placement of the terms "branch" and "organization" in the statute. Furthermore, the sentence begins with the term "however," establishing that the second sentence operates as a limit on the first. Moreover, read in context, the ordinary common meaning of the term "allotment" indicates that § 104 is intended to require a governor's consent to changes to the affiliation of a National Guard unit with particular branches of the armed forces. The term "allotment" is defined as, "1. The act of allotting . . . a. apportionment b. assignment to a particular person or thing or for a particular use." Webster's Third New International Dictionary 58 (1981). The Secretary's implementation of the recommendations would not change the "branch, organization or allotment of a unit" because the recommendations do not change the units' affiliation with a particular branch of the armed forces. Put more simply, the Secretary's implementation of the 2005 BRAC recommendations is not a change to the "branch, organization, or allotment of a unit."

The Governor also argues that language of 32 U.S.C. § 104 (a), which provides that "[e]ach State . . . may fix the location of the units and headquarters of its National Guard," establishes that her consent is required in order for the Secretary to implement the recommendations. Dkt. 17-1, at 17-18. This

argument is unpersuasive.  The term "may" is permissive.  Moreover, the Secretary points out that if the Governor chooses, she may "fix" the locations of the Washington National Guard units elsewhere at state expense, but that her consent is not required to relocate National Guard units from one facility under federal control to another facility under federal control at federal expense.

The Governor's § 104 claim, that her consent is required for implementation of the 2005 BRAC recommendations dealing with Washington's Air National Guard, is not barred by the political question doctrine.  However, based on the language, structure, objectives, legislative history, and nature of the executive branch action, Congress intended to preclude judicial review of claims such as the Governor's § 104 claim here.  Moreover, this is not a claim upon which relief can be granted.  Giving effect to both the plain language of 32 U.S.C.§ 104 and BRAC, § 104 does not impose a gubernatorial consent requirement to the Secretary's implementation of the 2005 BRAC recommendations at issue here.

### E.    EXCESS OF STATUTORY AUTHORITY CLAIM

The Secretary argues that the Governor's claim that his implementation of the recommendations will exceed his statutory authority under BRAC should be dismissed because: 1) consideration of the claim is barred by the political question doctrine, 2) this Court does not have subject matter jurisdiction because Congress intended to preclude judicial review of actions taken under BRAC, 3) the Governor does not identify a private cause of action or private remedy under BRAC, and 4) the Secretary did not exceed his statutory authority under BRAC.  Dkts. 16-1, and 18-1.  Each of these arguments will be addressed in turn.

#### 1.    Political Question Doctrine

The political question doctrine does not bar the Governor's claim that the Secretary will exceed his authority under BRAC when he implements the recommendations.  Like the Governor's § 104 claim, this claim requires the Court to engage in the traditional exercises of statutory construction, interpretation of constitutional provisions, and application of the law to the facts.  In regard to this claim, the Governor asks the Court to determine whether the Secretary will exceed his authority under BRAC based on the terms of the Act, not whether implementation of the 2005 BRAC recommendations is advisable military strategy.  These are the type of issues the Court has "discoverable and manageable standards for resolving," *Baker* at 212, and does not involve the Court in "policy choices and value determinations constitutionally committed

for resolution to the halls of Congress or the confines of the executive branch," *Japan Whaling Ass'n v. Am. Cetacean Society*, 478 U.S. 221, 230 (1986). The Court need not, nor will, engage in any decisions about the wisdom of particular military strategy in deciding this claim.

>   **2.      Congressional Intent to Preclude Review of a Claim that the Secretary's Implementation of the Recommendations will Exceed his Statutory Authority**

As explained above, Congress intended to preclude judicial review of actions taken under BRAC. However, the Governor points out that judicial review can be available if the federal officer is alleged to have acted beyond his statutory authority even if Congress has precluded review of other claims. Dkts. 17-1, at 41 and 19, at 5 (*citing e.g. Leedom v. Kyne,* 358 U.S. 184, 191(1968)(holding that federal court has subject matter jurisdiction to review a claim of an agency exceeding its statutory authority even when congress precluded judicial review of other claims). *Kyne* should not be read to grant courts judicial review of any claim that an agency action exceeds statutory authority in the face of contrary legislative intent. *Bd. of Gov. of Fed. Reserve Corp. v. MCorp*, 502 U.S. 32, 44 (1991). Judicial review should be available where a party, claiming that an agency has exceeded its statutory authority, would be wholly deprived "of a meaningful and adequate means of vindicating [her] statutory rights" were judicial review not available. *Id*., at 43. Judicial review of the Governor's claim that the Secretary will exceed his authority under BRAC when he implements the 2005 recommendations is the only " meaningful and adequate means of vindicating her statutory rights." Accordingly, her claim that the Secretary has exceeded his statutory rights under BRAC is subject to judicial review.

>   **3.      Private Right of Action and Private Remedy for Governor to Bring Claim that Secretary will Exceed his Statutory Authority Under BRAC if He Implements the Recommendations**

The Secretary argues that the Governor failed to identify a private right of action or private remedy for her, as Plaintiff, to bring the claim that the Secretary will exceed his statutory authority under BRAC when he implements the 2005 recommendations. Dkt. 16-1. He argues that her claims should be dismissed under Fed. R. Civ. Pro. 12(b)(6). *Id.*

Utilizing the *Cort* factors found in Section II. C. 2. Of this opinion, the Governor has failed to show that she has a private right of action and a private remedy under BRAC to challenge the Secretary's implementation of the recommendations. The Governor is not one of a class for whose benefit BRAC was passed. Moreover, as detailed above, the there is an indication that based on the text, structure, objectives,

1   and legislative history Congress did not intend to allow a Governor to enjoin implementation of a particular

2   BRAC recommendation.  It is also not consistent with the "purpose of the legislative scheme to imply such

3   a remedy for the plaintiff." *Cort* at 78.  "That the first two *Cort* factors weigh against finding a private right

4   of action is dispositive of [the] inquiry." *Opera Plaza* at 837.

5       **4.    Whether Governor's Claim that the Secretary's Implementation of the
            Recommendations will Exceed his Statutory Authority States a Claim Upon
6           Which Relief Can be Granted**

7       "The starting point in interpreting a statute is in its language, for if the intent of Congress is clear,

8   that is the end of the matter." *Good Samaritan Hospital v. Shalala*, 508 U.S. 402, 409 (1993).  The

9   Governor argues that the Secretary does not have any authority under BRAC to implement the 2005

10  recommendations concerning Fairchild Air Force Base.  Dkt. 17-1 at 31.  The Governor argues that the

11  Secretary's implementation of the 2005 BRAC recommendations do not constitute a "closure" or

12  "realignment of a military installation." *Id.* at 31-35.

13      Under BRAC the Secretary may, "take any such actions as may be necessary to close or realign any

14  military installation."  10 U.S.C. § 2687 note (§ 2905(a)(1)(A)).  BRAC defines the term "military

15  installation" as "a base, camp, post, station, yard, center, homeport facility for any ship, or other activity

16  under the jurisdiction of the Department of Defense, including any leased facility." § 2910(4).  The term

17  "closure" is not defined.  The term "realignment includes any action which both reduces and relocates

18  functions and civilian personnel positions but does not include a reduction in forces resulting from

19  workload adjustments, reduced personnel or funding levels, or skill imbalances." *Id.* at § 2910(5).

20      The three military sites at issue here, Fairchild Air Force Base, Four Lakes Communications

21  Station, and Geiger Field, meet BRAC's definition of "military installations" under the "jurisdiction of the

22  Department of Defense."  Parties do not dispute that Fairchild Air Force Base is a federal facility on federal

23  property, that Four Lakes Communications Station is a federally owned facility under license to the State

24  of Washington, or that Geiger Field is a state owned facility under lease to the United States.  Accordingly,

25  each are "military installations" subject to BRAC.

26      The Secretary's implementation of the 2005 BRAC recommendations regarding the realignment of

27  Fairchild Air Force Base fall within the actions contemplated by the statute.  On the outset, BRAC

28  specifically requires that the Secretary shall "realign all military installations recommended for realignment

ORDER
Page - 19

by Such Commission in each report." § 2904(a)(2). Parties do not dispute that the KC-135R aircraft used by the 141st Air Refueling Wing are the property of the federal government and remain the "property of the United States." 32 U.S.C. § 710(a). The transfer of these aircraft constitute a "relocation" of the function of flying these aircraft. The transferral of the 256th Combat Communications Squadron and 242nd Combat Communications Squadron to Fairchild Air Force Base is a relocation of their functions. Likewise, the "association" of the 141st Air Refueling Wing (ANG) with the 92nd Air Refueling Wing at Fairchild Air Force Base is a relocation of its functions. The Governor argues that none of these actions, taken separately, constitute realignment under the statutory definition, but this argument fails to consider the aggregate effect of the recommendations.

    The Governor argues that even if the recommendations fit within BRAC's definition of "realignment" of a "military installation," "the BRAC Act does not apply to closures and realignments to which section 2687 of Title 10, United States Code is not applicable." Dkt. 17-1, at 32 (*quoting* 10 U.S.C. 2687 note (§ 2909(2)). 10 U.S.C § 2687(a) applies to "the closure of any military installation at which at least 300 civilian personnel are authorized to be employed" or "any realignment . . . involving a reduction by more than 1,000, or by more than 50%, in the number of civilian personnel authorized to be employed at such military installation." She argues that the Secretary's implementation of the recommendations would not result in the reduction of the requisite number of civilian personnel and therefore does not come within the Secretary's authority. Dkt. 17-1, at 32. This argument is without merit. Section 2909 (c)(2) provides, "[n]othing in this part affects the authority of the Secretary to carry out . . . closures and realignments to which section 2687 of title 10, United States Code [this Section], is not applicable including closures and realignments carried out for reasons of national security or a military emergency. . . ." This provision does not mean that the implementation of the recommendations is barred because it does not result in a reduction in the requisite number of civilian positions.

    The Governor's claim that the Secretary will exceed his statutory authority under BRAC when he implements the 2005 BRAC recommendations is not barred by the political question doctrine. This claim also survives the Secretary's argument that Congress intended to preclude judicial review of actions taken under BRAC because the claim falls into one of the exceptions. However, the Governor fails to identify a private right of action and a private remedy under BRAC to challenge the Secretary's mandated

1   implementation of the 2005 BRAC recommendations as exceeding his statutory authority.  Moreover, this

2   claim fails because he is not exceeding his authority under the plain language of BRAC.

### III.   CONCLUSION

4   1) The Governor's Second Amendment claim should be dismissed as barred by the political

5   question doctrine.  2) The Governor's § 104 claim should be dismissed because Congress intended to

6   preclude judicial review of actions taken under BRAC, and therefore the Court does not have subject

7   matter jurisdiction over it.  Even if the Court has subject matter jurisdiction to review the Governor's claim

8   under § 104, the Secretary does not need the Governor's consent to implement the subject

9   recommendations.  3) The Governor's claim that the Secretary will exceed his statutory authority should

10  be dismissed because she has not identified a private right of action or a private remedy to challenge the

11  Secretary's implementation of the BRAC recommendations.  Even if she had such a private right of action

12  and private remedy, her claim that the Secretary's implementation of the 2005 recommendations would

13  exceed his statutory authority should be dismissed because, under BRAC's plain language, he has authority

14  to act.

15  The Secretary's Motion to Dismiss should be granted and the complaint dismissed.  The issues

16  having been resolved by the Motion to Dismiss, the Governor's Motion for Summary Judgment should be

17  denied as moot.

### IV.  ORDER

19  Therefore, it is hereby, **ORDERED** that:

20  • the Defendant's Motion to Dismiss (Dkt. 16-1) is **GRANTED** and

21  • Plaintiff's Motion for Summary Judgment (Dkt. 17-1) is **DENIED AS MOOT**.

22  The Clerk of the Court is directed to send uncertified copies of this Order to all counsel of record

23  and to any party appearing *pro se* at said party's last known address.

24  DATED this 14th day of November, 2006.

Robert J. Bryan
United States District Judge